**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TERUYA BROTHERS, LTD, and
SUBSIDIARIES,
              *Petitioner-Appellant,*

              v.

COMMISSIONER OF INTERNAL
REVENUE,
              *Respondent-Appellee.*

No. 05-73779

Tax Ct. No.
17955-03

OPINION

Appeal from a Decision of the Tax Court
Argued and Submitted
February 11, 2009—Honolulu, Hawaii

Filed September 8, 2009

Before: Stephen Reinhardt, Melvin Brunetti, and
Sidney R. Thomas, Circuit Judges.

Opinion by Judge Thomas

12623

## COUNSEL

Renee M.L. Yuen, Honolulu, Hawaii, for the petitioner-appellant.

Nathan J. Hochman, Assistant Attorney General, Jonathan S. Cohen, Bridget M. Rowan, Attorneys, Tax Division, Department of Justice, Washington, D.C., for the respondent-appellee.

## OPINION

THOMAS, Circuit Judge:

This case requires us to determine whether two like-kind exchanges involving related parties qualify for nonrecognition treatment under 26 U.S.C. § 1031. Under the circumstances presented by this case, we conclude that they do not, and we affirm the judgment of the Tax Court. We have jurisdiction over this appeal pursuant to 26 U.S.C. § 7482(a).[1]

I

Teruya Brothers, Ltd. ("Teruya") is a Hawaii corporation involved in, among other things, the purchase and development of residential and commercial real estate. This appeal concerns the tax treatment of real estate transactions involving two of Teruya's properties, the Ocean Vista condominium complex ("Ocean Vista"), and the Royal Towers Apartment building ("Royal Towers").

A

Teruya owned a fee simple interest in a parcel of land underlying the Ocean Vista complex in Honolulu, Hawaii. Golden Century Investments Company ("Golden") held a long-term lease on the land, and the Association of Apartment Owners of Ocean Vista ("the Association") held a sublease on the property.

In March 1993, the Association wrote to Teruya, inquiring about the possibility of purchasing Ocean Vista. Teruya responded that it was not interested in selling, though it later told Golden, which was also interested in the property, that it might part with the land through a like-kind exchange.

---

[1]Except where otherwise noted, all statutory references are to the Internal Revenue Code.

Following a series of negotiations, Golden sent a letter of intent to purchase Ocean Vista from Teruya for $1,468,500. It also offered its cooperation "so that Teruya can effectuate a [§ ] 1031 tax deferred exchange of Teruya's [i]nterests." The letter of intent was later amended to state, "It is understood and agreed that Teruya's obligation to sell Teruya's interests to [Golden] is conditioned upon Teruya consummating a [§ ] 1031 tax deferred exchange of Teruya's [i]nterests."

In June 1994, Teruya proposed purchasing real property known as Kupuohi II from Times Super Market, Ltd. ("Times"), a company in which it owned 62.5% of the common shares. The proposal stated that "The purchase will be subject to a [§] 1031 four party exchange," and allowed Teruya to cancel the proposed purchase "should the Ocean Vista transaction fail to proceed according to present plans." Times agreed to sell Kupuohi II for $2,828,000.

On April 3, 1995, the Association made a formal offer to purchase Ocean Vista for $1,468,500,[2] which Teruya accepted. The parties' contract provided that "Teruya may, in its sole discretion, structure this transaction as a tax-deferred exchange pursuant to section 1031 of the Internal Revenue Code." The contract also included as a condition precedent to the sale that "Teruya shall be in a position to close on its exchange replacement properties."

In August, T.G. Exchange, Inc. ("TGE") contracted to act as an "exchange party to complete the exchange" of Ocean Vista. TGE would convey Ocean Vista to the Association, and then acquire replacement property for Teruya with the Ocean Vista sale proceeds, all with the stated purpose of qualifying the exchange under 26 U.S.C. § 1031. Teruya agreed to identify suitable replacement property, and to provide any funds in excess of the Ocean Vista sale proceeds needed to

---

[2]Teruya, Golden, and the Association had executed an Assignment, Assumption, and Release which substituted the Association for Golden.

purchase the replacement property. The parties agreed that if Teruya could not locate suitable replacement property, the contract between Teruya and TGE would be terminated.

On September 1, 1995, per the agreement, TGE sold Ocean Vista to the Association for $1,468,500. That same day, TGE used the proceeds from the Ocean Vista sale along with an additional $1,366,056 from Teruya to purchase Kupuohi II from Times for $2,828,000.[3] TGE then transferred Kupuohi II to Teruya.

Teruya's basis in Ocean Vista was $93,270, but it deferred recognizing gain on its $1,345,169 in post-expense profits under the like-kind exchange provisions of 26 U.S.C. § 1031. Times had a basis in Kupuohi II of $1,475, 361, and realized and recognized a $1,352,639 gain on the property's sale. Times paid no tax on this gain, however, because it had a large net operating loss for the tax year in question.

In sum, before the transaction Teruya owned Ocean Vista and Times owned Kupuohi II. After the exchange, Teruya owned Kupuohi II, the Association owned Ocean Vista, and Times had the cash from the sale of Ocean Vista (along with additional funds from Teruya).

B

The Royal Towers exchange substantially mirrored the Ocean Vista transaction.

In 1994 Teruya owned a fee simple interest in Royal Towers, an apartment complex in Honolulu, Hawaii. Late that

---

[3]As the Tax Court noted below, some of the numbers in the parties' stipulation of facts yield computational inconsistencies. Where the Tax Court made express findings as to the correct figures, we adopt and incorporate those determinations. As the precise numbers involved are not relevant to this appeal, we otherwise leave in place the parties' stipulated figures without further notation.

year, Teruya agreed to sell Royal Towers to Savio Development Company ("Savio") for $13.5 million (later negotiated down to $11,932,000). As with the Ocean Vista transaction, this agreement was expressly conditioned on Teruya successfully completing a § 1031 exchange.

Anticipating that Royal Towers would soon be sold, in September 1994 Teruya sent Times a letter of intent to purchase two pieces of land known respectively as Kupuohi I and Kaahumanu. The letter was materially identical to the one Teruya sent to Times regarding Kupuohi II, and stated that "[t]he purchase will be subject to a [§] 1031 four party exchange," and that Teruya could cancel the proposed purchase "should the sale of the Royal Towers apartment fail to proceed according to present plans." Both companies' boards of directors approved the two properties' sale in early 1995, with Kupuohi I to be sold for $8,900,000, and Kaahumanu for $3,730,000.

In August 1995, Teruya contracted with TGE in order to qualify the exchange under § 1031. Similar to its agreement concerning the Ocean Vista exchange (which would be signed two days later), TGE would convey Royal Towers to Saito, acquiring replacement property for Teruya with the Royal Tower sale proceeds. Teruya agreed to identify suitable replacement property, and to provide any funds in excess of the Royal Towers sale proceeds needed to purchase the replacement property. The parties agreed that if Teruya could not locate suitable replacement property, the agreement between Teruya and TGE would be terminated.

TGE sold Royal Towers to Saito on August 24, 1995 for $11,932,000. Also on August 24, TGE used the proceeds from the Royal Towers sale along with $724,554 in additional funds from Teruya to purchase Kupuohi I and Kaahumanu from Times for $8,900,000 and $3,730,000, respectively. TGE then transferred the two properties to Teruya.

Teruya's basis in Royal Towers was $670,506, but it deferred the recognition of its $10,700,878 in post-expenses profits under 26 U.S.C. § 1031. Times had a basis in Kaahumanu of $1,502,960, and realized and recognized a $2,227,040 gain on the property's sale. Just as with Kupuohi II, though, Times paid no tax on this gain because it had a large net operating loss for the tax year in question.

Times had a basis in Kupuohi I of $15,602,152, and realized a capital loss of $6,453,372 on its sale. It did not recognize this loss, however, because 26 U.S.C. § 267 prohibits the recognition of losses from sales and exchanges of property between "related parties."[4]

In sum, before the exchanges Teruya owned Royal Towers and Times owned Kupuohi I and Kaahumanu. Afterwards, Teruya owned Kupuohi I and Kaahumanu, Savio owned Royal Towers, and Times held the cash from the sale of Royal Towers to Savio (along with additional funds from Teruya).

C

On its corporate income tax return for the taxable year ending March 31, 1996, Teruya, pursuant to 26 U.S.C. § 1031, deferred gain of $1,345,169 from the Ocean Vista transaction, and $10,700,878 from the Royal Towers transaction.

Rejecting Teruya's treatment of the exchanges, the IRS issued Teruya a notice of deficiency of $4,144,359 for the tax year ending March 31, 1996. Teruya petitioned the Tax Court for a redetermination. The Tax Court considered the petition on the basis of stipulated facts, and it affirmed the IRS's non-

---

[4]The definition of "related person" is drawn from 26 U.S.C. §§ 267(b) and 707(b)(1), and includes, *inter alia*, family members, partnerships, and entities over which the taxpayer has control (or which control the taxpayer). *See* 26 U.S.C. § 1031(f)(3). Teruya has stipulated that at all times relevant to this litigation it and Times were "related parties."

recognition treatment in a published opinion. *See Teruya Bros., Ltd. & Subsidiaries v. Comm'r of Internal Revenue*, 124 T.C. 45 (2005). This timely appeal followed.

## II

26 U.S.C. § 1031(a)(1) is a well-worn exception to the general rule that taxpayers must recognize gains or losses realized from the disposition of property in the year of realization. *See* 26 U.S.C. § 1001(c). Rather, in a so-called "section 1031" exchange, gain realized on the exchange of like-kind property held for productive business use or investment need not be recognized until the acquired property is finally disposed of. To preserve the appropriate tax consequences, the taxpayer retains his original basis in the newly acquired property. *Id.* at § 1031(d).

The concept behind this exception derives from the assumption that when an investor exchanges a piece of property for another of like-kind, he is merely continuing an ongoing investment, rather than ridding himself of one investment to obtain another. *See Starker v. United States*, 602 F.2d 1341, 1352 (9th Cir. 1979) ("The legislative history [of § 1031] reveals that the provision was designed to avoid the imposition of a tax on those who do not 'cash in' on their investments in trade or business property."). "In effect, the nonrecognition provisions further defer tax consequences when, notwithstanding an exchange, the taxpayer maintains a continuing interest in similar property." 2 Boris Bittker & Lawrence Lokken, Federal Taxation of Income, Estates and Gifts, (3d ed. 2000), ¶ 44.1.1.

Before 1989, taxpayers acting in concert could lawfully use § 1031 to defer the recognition of gain or accelerate the recognition of loss even as they cashed out of their investments, as indicated by the following example:

> [A]ssume *T* owns Blackacre, which is worth $100 and has a basis of $20, and her wholly owned corpo-

ration, *C* Corp., owns like kind property (Whiteacre), which is also worth $100 but has a basis of $140; *T* and *C* swap, and *C* immediately sells Blackacre to an unrelated person. If *T* had sold Blackacre, she would have recognized gain of $80, but *C*, whose $140 basis for Whiteacre becomes its basis for Blackacre, recognizes loss of $40. . . . [T]he presale exchange . . . [has] the effect of deferring recognition of *T*'s potential gain and accelerating recognition of *C*'s $40 loss.

*Id.* ¶ 44.2.8.

**[1]** Congress enacted § 1031(f) in 1989, largely eliminating what it considered to be a tax loophole contained in the section. *See* Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 7601, 103 Stat. 2106 (1989). Section 1031(f)(1) largely precludes the nonrecognition treatment of gain or loss when a taxpayer exchanges like-kind property with a related person, and when either party then disposes of the exchanged property within two years.[5]

---

[5]The subsection reads, in full:

§ 1031(f). Special rules for exchanges between related persons.

(1) In general. If—

(A) a taxpayer exchanges property with a related person,

(B) there is nonrecognition of gain or loss to the taxpayer under this section with respect to the exchange of such property (determined without regard to this subsection), and

(C) before the date 2 years after the date of the last transfer which was part of such exchange—

i) the related person disposes of such property, or

(ii) the taxpayer disposes of the property received in the exchange from the related person which was of like kind to the property transferred by the taxpayer, there shall be no nonrecognition of gain or loss under this section to the taxpayer with respect to such exchange; except that any gain or loss recognized by the taxpayer by reason of this subsection shall be taken into account as of the date on which the disposition referred to in subparagraph (C) occurs.

Congress also included § 1031(f)(4), which provides that a taxpayer may not claim nonrecognition treatment under § 1031 for "any exchange which is part of a transaction (or series of transactions) structured to avoid the purposes of [§ 1031(f)]."

Section 1031(f) includes several exceptions, as well. As relevant here, exchanges that otherwise run afoul of § 1031(f)(1)'s requirements may still qualify for nonrecognition treatment where "it is established to the satisfaction of the Secretary that neither the exchange nor [the subsequent property] disposition had as one of its principal purposes the avoidance of Federal income tax." § 1031(f)(2)(C).[6]

### III

### A

We review the Tax Court's conclusions of law and interpretations of the tax code *de novo. Westpac Pac. Food v. Comm'r of Internal Revenue*, 451 F.3d 970, 974 (9th Cir. 2006). We review the Tax Court's factual findings, including factual inferences drawn from a stipulated record, for clear error. *Smith v. Comm'r of Internal Revenue*, 300 F.3d 1023, 1028 (9th Cir. 2002).

[2] In conducting our analysis, we are mindful of the fact that tax classifications "turn on 'the objective economic realities of a transaction rather than . . . the particular form the parties employed.' " *Boulware v. United States*, 128 S. Ct. 1168, 1175 (2008) (quoting *Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978)). Exceptions to the general rule requiring the recognition of all gains and losses on property disposi-

---

[6]Nonrecognition treatment is also accorded to otherwise improper like-kind exchanges where the property is disposed of after the taxpayer's or related party's death, or in a compulsory or involuntary conversion. *See* § 1031(f)(2)(A)-(B).

tions are to be "strictly construed and do not extend either beyond the words or the underlying assumptions and purposes of the exception." 26 CFR 1.1002-1(b). Thus, "[n]onrecognition is accorded by the Code only if the exchange is one which satisfies both (1) the specific description in the Code of an excepted exchange, and (2) the underlying purpose for which such exchange is excepted from the general rule." *Id.*[7]

B

**[3]** As an initial matter, the government quite properly concedes that the Ocean Vista and Royal Towers transactions both qualify as like-kind exchanges under § 1031(a)(1). Indeed, although significantly more complex than "traditional" two-party transactions, four-party like-kind exchanges like those utilized here have existed for nearly as long as the § 1031 exception itself. *See, e.g.*, *Mercantile Trust Co. v. Comm'r of Internal Revenue*, 32 B.T.A. 82 (1935). The Tax Court has succinctly described such exchanges' general form:

> Involved in this type of exchange is a taxpayer desiring to exchange property, a prospective purchaser of the taxpayer's property, a prospective seller of the property the taxpayer wishes to receive in exchange, and a fourth party. In a simultaneously executed transaction (usually done through escrow) the fourth party receives the taxpayer's property and sells that property to the prospective purchaser. With the funds he receives, he purchases the prospective seller's property and then transfers that property to the taxpayer. When the smoke has cleared, the taxpayer has exchanged his property in a so-called 1031 transac-

---

[7]The examination in this case began before the July 22, 1998 effective date of 26 U.S.C. § 7491, so that section's burden-shifting rules do not apply here. *See* Internal Revenue Service Restructuring and Reform Act of 1998, Pub L. No. 105-206, Title III, § 3001(a), 112 Stat. 685, 726-27 (1998).

tion, the prospective purchaser has the taxpayer's property, the prospective seller has cash, and the fourth party, with the exception of agreed compensation, nothing.

*Coupe v. Comm'r of Internal Revenue*, 52 T.C. 394, 405 (1969) (citing *Mercantile Trust*, 32 B.T.A. 82). Applying this framework to our case, Teruya is the taxpayer, Times the prospective seller, the Association and Saito each prospective purchasers, and TGE the "fourth party," or qualified intermediary.[8]

The government also does not argue that § 1031(f)(1)'s restrictions on direct exchanges between related parties encompass these indirect transactions. For like-kind exchanges conducted through a qualified intermediary, as these were, "the qualified intermediary is not considered the agent of the taxpayer for purposes of section 1031(a)." 26 C.F.R. § 1.1031(k)-1(g)(4)(i). Teruya, therefore, may be said to have exchanged properties with TGE, not "with a related person," as required to implicate § 1031(f)(1).

[4] Thus, these exchanges may only be denied nonrecognition treatment if they were "part of a transaction (or series of transactions) structured to avoid the purposes of [§ 1031(f)]." § 1031(f)(4).

The first step in determining whether these transactions were structured to avoid § 1031(f)'s purposes is, of course, identifying what those purposes are. To discern a statute's purposes, "we look first to the language of the statute and sec-

---

[8]A qualified intermediary is a person, not the taxpayer or one closely related to him, who "[e]nters into a written agreement with the taxpayer . . . and, as required by the exchange agreement, acquires the relinquished property from the taxpayer, transfers the relinquished property, acquires the replacement property, and transfers the replacement property to the taxpayer." 26 C.F.R. § 1.1031(k)-1(g)(4)(iii).

ond to its legislative history." *In re Stringer*, 847 F.2d 549, 551 (9th Cir. 1988). In this case, though, the statute's text provides precious few clues as to Congress's intent. Section 1031(f)'s existence alone tells us that Congress wanted to limit the ability of related parties to claim nonrecognition treatment for § 1031 exchanges. But, given that Teruya's exchanges are not expressly covered under § 1031(f)(1), it would beg the question to conclude from the statute's text alone that Congress wanted to deny these transactions nonrecognition treatment.

Accordingly, we turn to § 1031(f)'s legislative history.

**[5]** The House Report accompanying § 1031(f) establishes that one of Congress's primary concerns in passing this legislation was its belief "that the 'like-kind' standard as applied to exchanges of property [wa]s too broad." H.R. Rep. No. 101-247, pt. 6, at 1340 (1989). "Under present law, taxpayers have been granted nonrecognition treatment . . . in circumstances where they have significantly changed their investment as a result of the exchange or conversion." *Id.* Instead, the committee felt "it is appropriate to accord nonrecognition treatment only to exchanges and conversions where a taxpayer can be viewed as merely continuing his investment." *Id.*

**[6]** Congress also wanted to prevent related parties from taking advantage of § 1031(d)'s basis-shifting provisions to avoid gains or accelerate losses on cashed-out investments. The House committee wrote:

> Because a like-kind exchange results in the substitution of the basis of the exchanged property for the property received, related parties have engaged in like-kind exchanges of high basis property for low basis property in anticipation of the sale of the low basis property in order to reduce or avoid the recognition of gain on the subsequent sale. Basis shifting also can be used to accelerate a loss on retained

property. The committee believes that if a related party exchange is followed shortly thereafter by a disposition of the property, the related parties have, in effect, 'cashed out' of the investment, and the original exchange should not be accorded nonrecognition treatment.

*Id.*

Finally, the House committee offered an example of a transaction it intended § 1031(f)(4) to cover:

[I]f a taxpayer, pursuant to a prearranged plan, transfers property to an unrelated party who then exchanges the property with a party related to the taxpayer within 2 years of the previous transfer in a transaction otherwise qualifying under section 1031, the related party will not be entitled to nonrecognition treatment under section 1031.

*Id.* at 1341.

## C

**[7]** With this legislative background in mind, we conclude that the Tax Court did not err in determining that the transactions were structured to avoid the purposes of § 1031(f)(4). Under the guise of a like-kind exchange, the transactions allowed related parties to receive nonrecognition treatment while cashing out of investments using § 1031's basis-shifting provisions. Precluding this type of tax result was one of Congress's primary aims in enacting § 1031(f)(4).

**[8]** We first reject Teruya's contention that the economic consequences of these transactions to Times are irrelevant to our inquiry, and that Teruya's continued investment in real property is dispositive. Section 1031(f)(1)(C)(i) disallows nonrecognition treatment if the related party disposes of

exchanged property within two years, regardless of whether the taxpayer does as well. Thus, examining the taxpayer and related party's economic position in aggregate is often the only way to tell if § 1031(f) applies. Moreover, Congress's concern about related taxpayers acting in concert, as well as the House Report's admonition that exchanges should not be accorded nonrecognition treatment where "the related *parties* have, in effect, 'cashed out' of" the investment," H.R. Rep. No. 101-247, pt. 6, at 1340 (emphasis added), confirm that the taxpayer and the related party should be treated as an economic unit in this inquiry. Taxpayers cannot escape § 1031(f) simply by hiding the benefits of improper like-kind exchanges with a related party.

**[9]** Here, the changing economic positions of Teruya and Times readily show that the related parties used these exchanges to cash out of an investment in low-basis property. Before the exchanges, Teruya owned Ocean Vista and Royal Towers, and Times owned Kupuohi I, Kupuohi II, and Kaahumanu. After the exchanges, Ocean Vista and Royal Towers had been sold, Teruya owned Kupuohi I, Kupuohi II, and Kaahumanu, and Times now had the cash from the Ocean Vista and Royal Towers sale (along with boot from Teruya). All in all, Teruya and Times decreased their investment in real property by approximately $13.4 million, and increased their cash position by the same amount. By allowing Teruya and Times to cash out of a significant investment in real property under the guise of a non-taxable like-kind exchange, these transactions were undoubtedly structured in contravention of Congress's desire that nonrecognition treatment only apply to transactions "where a taxpayer can be viewed as merely continuing his investment." *See* H.R. Rep. No. 101-247, pt. 6, at 1340.

Indeed, as Teruya could have achieved the same property dispositions through far simpler means, it appears that these transactions took their peculiar structure for no purpose except to avoid § 1031(f). Teruya could have exchanged its

properties directly with Times, followed by Times selling Ocean Vista and Royal Towers to the third-party purchasers. There was no need to use (and pay) a qualified intermediary. The rub, of course, is that Teruya couldn't have done this tax free, as direct exchanges between related parties are ineligible for nonrecognition treatment when the exchanged property is sold within two years. Instead, Teruya employed TGE, whose presence ensured that Teruya was technically exchanging properties with the qualified intermediary, not with its related party. TGE's involvement in these transactions thus served no purpose besides rendering simple — but tax disadvantageous — transactions more complex in order to avoid § 1031(f)'s restrictions.[9]

Our initial conclusion that these transactions were structured to avoid § 1031(f)'s purposes does not end our inquiry, for Teruya argues, and the Tax Court held below, that § 1031(f)(2) provides an additional limitation on § 1031(f)(4)'s scope.

[10] As discussed previously, § 1031(f)(2) establishes several circumstances where a related party exchange may still qualify for nonrecognition treatment despite technically violating § 1031(f)(1). The broadest of these exceptions, § 1031(f)(2)(C), allows otherwise improper exchanges to earn

---

[9]We do not imply that taxpayers are precluded from using a qualified intermediary to facilitate a like-kind exchange with a related party. Qualified intermediaries may provide legitimate services to facilitate complex (but permissible) exchanges, such as by assisting with escrow. However, given the facts of this case, we conclude that the Tax Court did not clearly err in inferring that the qualified intermediary was interposed in this case in an attempt to circumvent the § 1031(f)(1) limitations. The government argues that every deferred exchange between related parties involving a qualified intermediary should be recast as a direct exchange between the related parties. Under that analysis, the government argues, if § 1031(f)(1) would preclude nonrecognition treatment for the recast transaction, then the deferred exchange should be deemed to have been structured to avoid the purposes of § 1031(f). The Tax Court properly rejected that mechanical theory as inconsistent with the structure of the statute.

nonrecognition treatment where "it is established to the satisfaction of the Secretary that neither the exchange nor [the subsequent] disposition had as one of its principal purposes the avoidance of Federal income tax."[10]

[11] By their plain language, § 1031(f)(2)'s exceptions only apply to exchanges that violate § 1031(f)(1), which, as discussed above, these exchanges do not. Still, the Tax Court held below that "[b]ecause [§ 1031(f)(2)] is subsumed within the purposes of § 1031(f), any inquiry into whether a transaction is structured to avoid the purposes of section 1031(f) should also take this exception into consideration." *Teruya Brothers*, 124 T.C. at 53. We agree. Section 1031(f)(4) denies nonrecognition treatment only to those transactions that violate § 1031(f)(1)'s purposes. As transactions falling within § 1031(f)(2)'s exceptions by their very nature do not violate those purposes, § 1031(f)(2) must independently limit § 1031(f)(4)'s scope. In other words, a transaction does not violate § 1031(f)(4) if the taxpayer can establish "to the satisfaction of the Secretary" that the transaction did not have "as one of its principal purposes the avoidance of Federal income tax."

---

[10]The subsection reads:

§ 1031(f). Special rules for exchanges between related persons.
. . .

　(2) Certain dispositions not taken into account. For purposes of paragraph (1)(C), there shall not be taken into account any disposition—

　　(A) after the earlier of the death of the taxpayer or the death of the related person,

　　(B) in a compulsory or involuntary conversion . . . if the exchange occurred before the threat or imminence of such conversion, or

　　(C) with respect to which it is established to the satisfaction of the Secretary that neither the exchange nor such disposition had as one of its principal purposes the avoidance of Federal income tax.

**[12]** Despite our determination that § 1031(f)(2) independently limits § 1031(f)(4), we conclude that the record supports the Tax Court's determination that the improper avoidance of federal income tax was one of the principal purposes behind these exchanges. We therefore affirm the Tax Court's denial of nonrecognition treatment to Teruya.[11]

The Tax Court's conclusion that these transactions were structured for unwarranted tax avoidance purposes is supported by an examination of the tax consequences of the Royal Towers exchange. Had Teruya sold Royal Towers directly to Saito, it would have had to recognize nearly $11 million in gain. Because the transaction was presented as a like-kind exchange, however, only Times, which sold Kupuohi I and Kaahumanu to TGE, had to recognize any profit. However, Kaahumanu had a much higher basis than Royal Towers (relative to its fair market value), and Kupuohi I's basis far exceeded its fair market value. Thus, Times recognized only $2.2 million in gain on the transaction, far less than Teruya would have faced from the direct sale of Royal Towers. Moreover, Times paid no tax on even this smaller gain, as it was able to carry over net operating losses from previous years. Similarly, in the Ocean Vista transaction, though Times recognized gain virtually identical to that which Teruya deferred, Times paid no tax due to its net operating losses. Thus, the Teruya/Times economic unit achieved far more advantageous tax consequences by employing this

---

[11]In other contexts involving similar language, courts have disagreed on the standard to apply in reviewing whether a taxpayer has established a fact "to the satisfaction of the Secretary." *Compare R.E. Dietz Corp. v. United States*, 939 F.2d 1, 5 (2d Cir. 1991) (applying arbitrary and capricious standard), *with Schoneberger v. Comm'r of Internal Revenue*, 74 T.C. 1016, 1024 (1980) (applying "strong proof" standard). We need not decide the appropriate standard to apply, nor do we interpret the precise contours in this context of the phrase "to the satisfaction of the Secretary."

unique structure than it would have had Teruya simply sold its properties to the third-party buyers itself.[12]

Teruya contends that it did not have an improper tax avoidance purpose because it never had any fixed right to cash at the time of these transactions; indeed, the exchanges could only have been completed as § 1031(a) like-kind exchanges. But this argument misses the point. Teruya's undisputed intent to complete successfully a like-kind exchange — perhaps germane to whether the transactions were exchanges or sales under § 1031(a) — is irrelevant to whether these transactions were structured to avoid § 1031(f)'s purposes. Moreover, by focusing only on its own continued investment in like-kind property, Teruya ignores the crucial tax consequences of these exchanges to its related party, Times.[13]

## IV

**[13]** For the aforementioned reasons, we affirm the Tax Court's determination that these exchanges were structured to avoid the purposes of § 1031(f), and thus violate § 1031(f)(4).

AFFIRMED.

---

[12]Theoretically, the tax price to Times from reducing its net operating losses may have equaled or even exceeded the tax Teruya deferred, particularly in the Ocean Vista transaction. *See generally* Kelly Alton et al., *Related-Party Like-Kind Exchanges*, 115 TAX NOTES 467, at *26-27 (2007). We need not determine whether this possibility would evince a non-tax avoidance purpose, as Teruya has not argued the point on appeal.

[13]The Conference Committee Report to § 1031(f) suggests several kinds of transactions between related parties that "generally" will not have unwarranted tax avoidance as a principal purpose, such as exchanges that do not involve basis shifting. *See* 101 H.R. Conf. Rep. No. 386, at 614. Teruya has not argued that its exchanges fall within these exceptions.