# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-3411

_____

North Central Rental & Leasing, LLC, by and through its Tax Matters Partner, M. Daniel Butler

*Plaintiff - Appellant*

v.

United States of America

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of North Dakota - Fargo

_____

Submitted: October 7, 2014
Filed: March 2, 2015

_____

Before MURPHY, SMITH, and GRUENDER, Circuit Judges.

_____

SMITH, Circuit Judge.

The Internal Revenue Service (IRS) determined that North Central Rental & Leasing, LLC ("North Central") had improperly claimed "nonrecognition treatment"[1]

_____

[1]"Nonrecognition treatment" of a gain generally means that the gain is not included in the taxpayer's gross income at the time the taxpayer actually sells or

of gains from certain property exchanges. North Central filed suit against the United States, seeking a determination that its gains from the exchanges were, in fact, entitled to nonrecognition treatment. The district court[2] entered judgment in favor of the United States, and North Central appealed. We affirm.

## I. *Background*

Butler Machinery Company ("Butler Machinery") sells agricultural, mining, and construction equipment for manufacturers, primarily Caterpillar, Inc. ("Caterpillar"). Prior to 2002, Butler Machinery conducted a rental and leasing business in conjunction with its retail sales business. In 2002, however, Butler Machinery formed subsidiary North Central to take over Butler Machinery's rental and leasing operations.

Although separate entities, Butler Machinery and North Central are closely related and ultimately controlled by the same family. Indeed, Daniel Butler and certain of his family members own Butler Machinery, which in turn owns a 99 percent interest in North Central. Daniel Butler directly owns the remaining 1 percent of North Central. Both Daniel Butler and his sister Twylah Blotsky are board members of both Butler Machinery and North Central. Butler Machinery shares building space with North Central, performs accounting and equipment-ordering functions for North Central, and even initially pays the wages of North Central's employees.[3] Caterpillar assigned separate dealer codes to North Central and Butler Machinery, which enabled

---

exchanges the property giving rise to the gain. *See* 26 U.S.C. § 1031.

[2]The Honorable Karen K. Klein, United States Magistrate Judge for the District of North Dakota, sitting by designation and the parties' consent pursuant to 28 U.S.C. § 636(c).

[3]North Central eventually reimburses Butler Machinery on an allocated basis for the shared services given that North Central technically operates as a separate financial entity.

each entity to independently purchase its own equipment from Caterpillar; however, Butler Machinery used its own dealer code to order equipment for both itself and North Central.

## A. *LKE Program*

At issue in this case is North Central's like-kind-exchange (LKE) program, which commenced less than two months after Butler Machinery formed North Central. In a nutshell, the LKE program allowed North Central to trade used equipment for new equipment and, in the process, defer tax recognition of any gains or losses from the transactions. Per the LKE program, North Central sold its used equipment to third parties, and the third parties paid the sales proceeds to a qualified intermediary, Accruit, LLC ("Accruit"). Accruit forwarded the sales proceeds to Butler Machinery, and the proceeds "went into [Butler Machinery's] main bank account." At about the same time, Butler Machinery purchased new Caterpillar equipment for North Central and then transferred the equipment to North Central via Accruit. Butler Machinery charged North Central the same amount that Butler Machinery paid for the equipment.

Butler Machinery's use of LKE transactions in this fashion facilitated favorable financing terms from Caterpillar (referred to as "DRIS" financing terms). Caterpillar advised Butler Machinery before it established either North Central or the LKE program that such a transaction structure would enable Butler Machinery "to take full advantage of [Caterpillar's] DRIS payment terms." The DRIS payment terms, among other things, gave Butler Machinery up to six months from the date of the invoice to pay Caterpillar for North Central's new equipment. During that time, Butler Machinery could use the sales proceeds it received from Accruit for essentially whatever business purposes it wanted, such as paying bills or payroll. In other words, Butler Machinery essentially received an up-to-six-month, interest-free loan from each exchange.

## B. *Representative Transactions*

The parties stipulated to two exchange transactions that they agree are representative of the 398 LKE transactions at issue in this case. Because the two stipulated transactions are essentially identical, the district court focused on only one of them: the exchange of Truck 1 (North Central's relinquished property) for Truck 2, Skid Steer 1, and Skid Steer 2 (North Central's replacement property). So will we.

In the representative transaction, North Central agreed on or before June 30, 2004, to sell Truck 1 to a third party for $756,500. North Central's adjusted tax basis in Truck 1 was $129,372.70 at the time. The third party paid Accruit the $756,500 in sales proceeds, and North Central transferred to the third party legal ownership of Truck 1.

On or about August 13, 2004, Butler Machinery identified and purchased the replacement Caterpillar equipment, Truck 2 and Skid Steers 1 and 2. Butler Machinery's total acquisition price for this new property was $761,065.60. Butler Machinery then transferred legal ownership of the replacement property to North Central through Accruit on August 27, 2004.

On September 10, 2004, Accruit transferred the $756,500 in proceeds from the sale of Truck 1 to Butler Machinery. North Central and Butler Machinery then adjusted a note between the two companies to compensate Butler Machinery for the $4,565.60 difference between the $756,500 in sale proceeds and the $761,065.60 that Butler Machinery paid for the replacement equipment.

Thus, in the immediate aftermath of the transaction, (1) a third party owned Truck 1; (2) North Central held its replacement property (Truck 2 and Skid Steers 1 and 2) and an adjusted note reflecting its new $4,565.60 debt to Butler Machinery; and (3) Butler Machinery possessed the $756,500 in sale proceeds from Truck 1 and an adjusted note reflecting its new $4,565.60 credit to North Central. North Central

deferred recognizing the $627,127.30 gain it realized from the transaction (the difference between the $756,500 in sales proceeds from Truck 1 and North Central's $129,372.70 adjusted tax basis in Truck 1), claiming the gain was entitled to nonrecognition treatment under 26 U.S.C. § 1031. And Butler Machinery, per Caterpillar's DRIS financing terms, had essentially unfettered use of the sales proceeds from Truck 1 for nearly six months before it was obligated to pay Caterpillar for the replacement equipment.

## C. *Procedural History*

From 2004 to 2007 North Central claimed nonrecognition treatment of gains from 398 LKE transactions pursuant to § 1031. The IRS issued final partnership administrative adjustments for those taxable years, which declared that the transactions were not entitled to nonrecognition treatment. The IRS concluded that North Central structured the transactions to avoid the related-party exchange restrictions provided under § 1031(f). North Central then brought an action against the United States, alleging the LKE transactions were entitled to nonrecognition treatment.

Following a three-day bench trial from April 2 to April 4, 2013, the district court found, among other things, that the transactions were not entitled to nonrecognition treatment and were "structured to avoid the purposes of § 1031(f)." In so holding, the court analyzed Butler Machinery's "receipt of cash in exchange for equipment, together with its unfettered access to the cash proceeds," as well as the relative complexity of the transactions. The district court accordingly entered judgment in favor of the United States, and North Central appealed.

## II. *Discussion*
## A. *Statutory Framework*

As a general rule, taxpayers must immediately recognize the gains or losses they realize from the disposition of their property. *See* 26 U.S.C. § 1001(c). Taxpayers

can defer recognizing such gains or losses, however, when they exchange "property held for productive use in a trade or business or for investment if such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment." 26 U.S.C. § 1031(a)(1). This LKE exception distinguishes a taxpayer who conducts an LKE from a taxpayer who liquidates or "cashes in" on his or her original investment. With an LKE the taxpayer essentially continues his or her original investment via the like-kind property. *See Ocmulgee Fields, Inc. v. C.I.R.*, 613 F.3d 1360, 1364 (11th Cir. 2010); *Starker v. United States*, 602 F.2d 1341, 1352 (9th Cir. 1979) ("The legislative history [of § 1031(a)] reveals that the provision was designed to avoid the imposition of a tax on those who do not 'cash in' on their investments in trade or business property.").

After Congress enacted the LKE exception, however, sophisticated parties exploited the exception in a manner inconsistent with its purpose. Some entities agreed to structure transactions such that they could actually cash in on their investments while nevertheless claiming nonrecognition treatment under § 1031. *See Ocmulgee Fields,* 613 F.3d at 1365; *Teruya Bros. v. C.I.R.*, 580 F.3d 1038, 1042 (9th Cir. 2009). The following hypothetical illustrates how such transactions were structured:

> [A]ssume *T* owns Blackacre, which is worth $100 and has a basis of $20, and her wholly owned corporation, *C* Corp., owns like kind property (Whiteacre), which is also worth $100 but has a basis of $140; *T* and *C* swap, and *C* immediately sells Blackacre to an unrelated person. If *T* had sold Blackacre, she would have recognized gain of $80, but *C*, whose $140 basis for Whiteacre becomes its basis for Blackacre, recognizes loss of $40. . . . [T]he presale exchange . . . [has] the effect of deferring recognition of *T*'s potential gain and accelerating recognition of *C*'s $40 loss.

*Teruya Bros.*, 580 F.3d at 1042 (alternations in original; quotation omitted).

Congress attempted to close this perceived loophole in 1989 when it passed § 1031(f). *See* Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 7601, 103 Stat. 2106 (1989). Section 1031(f)(1) generally prohibits nonrecognition treatment for exchanges in which a taxpayer exchanges like-kind property with a "related person," and either party then disposes of the exchanged property within two years of the exchange. Moreover, in an attempt to thwart the future use of more complex transactions that technically avoid the provisions of § 1031(f) but nevertheless run afoul of the purposes of the law, Congress also enacted § 1031(f)(4)—which broadly prohibits nonrecognition treatment for "any exchange which is part of a transaction (or a series of transactions) structured to avoid the purposes of" § 1031(f).

### B. *Purpose of the Transactions*

"After a bench trial, this court reviews the district court's findings of fact for clear error, and its legal conclusions de novo." *Lisdahl v. Mayo Found.*, 633 F.3d 712, 717 (8th Cir. 2011). The core issue in this appeal is whether the district court erred in determining that North Central structured the exchange transactions to avoid the purposes of § 1031(f). This is a factual issue subject to clear error review. *See Lisdahl*, 633 F.3d at 717.

We begin by noting the comparative complexity of the transactions at issue. *See Ocmulgee Fields*, 613 F.3d at 1369 (affirming a determination that an exchange was structured to avoid the purposes of § 1031(f) in part because of the unnecessary complexity and unnecessary parties involved in the transaction); *Teruya Bros.*, 580 F.3d at 1046 (same). As discussed above, the transactions each involved an intricate interplay between at least five parties: North Central, Accruit, Butler Machinery, Caterpillar, and the third party who buys North Central's used equipment. Of course, North Central, Caterpillar, and the third-party customer were indisputably necessary for the sales and purchase transactions to occur. Butler Machinery and Accruit, however, were not.

As North Central acknowledges in its briefing, Butler Machinery functioned "as a passthrough of both the cash and the property." This begs the question of why Butler Machinery was involved at all in the transactions. Elsewhere in its briefing North Central proffers several alternative reasons for Butler Machinery's involvement, including that it made the transactions administratively easier and more efficient. None of these arguments, however, convince us that the district court clearly erred in reaching a different conclusion. After all, North Central already had its own dealer code, and it could have placed the exact same equipment orders directly to Caterpillar. Injecting Butler Machinery into the transactions added unnecessary inefficiencies and complexities to the transactions, including, among other things, additional transfers of payment and property.

An equally (if not more) plausible explanation for Butler Machinery's involvement is that Butler Machinery financially benefitted from what amounted to six-month, interest-free loans under the DRIS financing terms. *See Ocmulgee Fields,* 613 F.3d at 1369 (analyzing "the actual consequences" of the transactions to ascertain the taxpayer's intent); *Teruya Bros.*, 580 F.3d at 1045 ("[T]he taxpayer and the related party should be treated as an economic unit in this inquiry."). As discussed above, the DRIS financing gave Butler Machinery up to six months to pay its invoices to Caterpillar. In the meantime, the sales proceeds from the relinquished equipment were deposited into Butler Machinery's "main bank account," and Butler Machinery was able to use the proceeds as it pleased. The value of Butler Machinery's interest-free access to such money should not be underestimated.[4]

_____

[4]For instance, purely by way of illustration, assume that Butler Machinery could have obtained DRIS financing terms for merely 350 of the exchanges at issue in this case, and that the average sales proceeds received from the property relinquished in the transactions was $600,000 (which is less than the sales proceeds received in each of the stipulated transactions). In this scenario, Butler Machinery would have received a total of $210,000,000 in de facto interest-free loans.

Butler Machinery attempts to downplay the benefit it derived from these de facto interest-free loans by asserting that North Central would have received the same financing terms if it had ordered directly from Caterpillar. The President and CEO of Accruit, however, testified at trial that Accruit would have paid the sales proceeds from the relinquished property *directly to Caterpillar* if the new equipment were not purchased via Butler Machinery. In other words, if Butler Machinery was not involved in these transactions, neither Butler Machinery nor North Central would have received the de facto interest-free loans.

In sum, Butler Machinery was not necessary to the transactions at issue yet possessed significant, unearmarked cash proceeds as a result of the transactions. Both the Eleventh Circuit and the Ninth Circuit have affirmed determinations that transactions were structured to avoid the purposes of § 1031(f) when unnecessary parties participated in the transactions and when a related party ended up receiving cash proceeds. *See Ocmulgee Fields,* 613 F.3d at 1369; *Teruya Bros.*, 580 F.3d at 1046. North Central argues that this case is unique because Butler Machinery did not have indefinite access to the sales proceeds from each transaction. Even so, that fact does not change our analysis, and we simply cannot ignore the significant and continuous financial benefits Butler Machinery derived from these hundreds of de facto interest-free loans. Indeed, as the Ninth Circuit noted in *Starker v. United States*, "if . . . taxpayers sell their property for cash and reinvest that cash in like-kind property, they cannot enjoy [§ 1031's] benefits, even if the reinvestment takes place just a few days after the sale." 602 F.2d at 1352. This court reached a similar conclusion in *Coleman v. Commissioner of Revenue*, in which we affirmed a determination that $14,000 a taxpayer received as part of an exchange should be recognized as taxable gain—even though the money was allegedly intended to apply to a mortgage the taxpayer assumed in the exchange. 180 F.2d 758, 760 (8th Cir. 1950). Critically for purposes of our analysis, the taxpayer in *Coleman* "was at liberty to use [the cash] as he pleased," *id.*, just like Butler Machinery was in this case.

Accruit was also an unnecessary party to these transactions. Butler Machinery and North Central could have exchanged property directly with each other without Accruit's involvement. This unnecessary layer of complexity lends support to a finding that the exchanges were structured to sidestep § 1031(f). Indeed, the Eleventh Circuit in *Ocmulgee Fields* affirmed a determination that exchanges were structured to avoid the purposes of § 1031(f), in part, because the parties could have completed the transactions *without* the involvement of a qualified intermediary. *See* 613 F.3d at 1370, 1373. Moreover, the Ninth Circuit reached the same conclusion in *Teruya Brothers* and further held that a qualified intermediary's "involvement in [the underlying] transactions thus served no purpose besides rendering simple—but tax disadvantageous—transactions more complex in order to avoid § 1031(f)'s restrictions." 580 F.3d at 1046 (footnote omitted). Notably, if Butler Machinery and North Central exchanged the property directly with each other, they, as related parties, would have to hold the exchanged-for property for two years before the exchanges could qualify for nonrecognition treatment. *See* 26 U.S.C. § 1031.[5] Hence, their need for Accruit.

North Central argues that Accruit was nevertheless necessary for its LKE program to qualify for certain "safe harbors" established under 26 C.F.R. §§ 1.1031(k)–1 *et seq*. and Revenue Procedure 2003-39. North Central's safe harbor argument is unavailing. It simply has not shown that the district court committed clear error in finding the intent behind the transactions' structure. *See F.D.I.C. v. Lee*, 988 F.2d 838, 841–42 (8th Cir. 1993) ("[I]f a district court's factual determination 'falls within a broad range of permissible conclusions,' then it must be upheld" under clear error review) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 400 (1990)). Furthermore, the safe harbor rationale does not explain why Butler Machinery was involved at all in these 398 exchange transactions. In short, because North Central

---

[5]North Central does not dispute that it and Butler Machinery are "related" parties under the statute.

"could have achieved the same property dispositions" via a much "simpler means," it appears "these transactions took their peculiar structure for no purpose except to avoid § 1031(f)." *Teruya Bros.*, 580 F.3d at 1046.

The district court did not commit clear error by finding that the LKE transactions were structured to avoid the purposes of § 1031(f).

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____