**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HENRY SAMUELI; SUSAN F. SAMUELI,
     *Petitioners-Appellants,*

v.

COMMISSIONER OF INTERNAL
REVENUE,
     *Respondent-Appellee.*

No. 09-72457

Tax Ct. No.
13953-06

PATRICIA W. RICKS; THOMAS G.
RICKS,
     *Petitioners-Appellants,*

v.

COMMISSIONER OF INTERNAL
REVENUE,
     *Respondent-Appellee.*

No. 09-72458

Tax Ct. No.
14147-06

ORDER AND
AMENDED
OPINION

Appeals from a Decision of the Tax Court

Argued and Submitted
July 21, 2011—San Francisco, California

Filed September 15, 2011
Amended November 1, 2011

Before: A. Wallace Tashima and Johnnie B. Rawlinson,
Circuit Judges, and Jed S. Rakoff, Senior District Judge.*

---

*The Honorable Jed S. Rakoff, Senior United States District Judge for
the Southern District of New York, sitting by designation.

19771

Opinion by Judge Tashima;
Concurrence by Judge Rawlinson

## COUNSEL

Richard M. Lipton, Baker & McKenzie, Chicago, Illinois, for the petitioners-appellants.

Bethany B. Hauser, Tax Division, U.S. Department of Justice, Washington, DC, for the respondent-appellee.

---

**ORDER**

Petitioners-appellants' petition for panel rehearing, which is unopposed by respondent-appellee, at least in part, is granted. The Opinion, filed September 15, 2011, slip op. 17597, 2011 WL 4090777, is amended, as follows:

1.  In the second full paragraph on slip op. at 17619, line 3, the word <purpose> shall be substituted for the word <purchase> in the phrase <a non-tax business or corporate purpose.>

2.  The first paragraph on slip op. at 17628, commencing with "This error, however, did not make a difference . . ." and ending with "we affirm the Tax Court's ultimate deficiency determination." is deleted, and replaced by the following:

> "This error requires that in No. 09-72457 the case be remanded to the Tax Court for redetermination of Taxpayers Samuelis' 2003 tax liabilities. In No. 09-72458, we affirm the Tax Court's ultimate deficiency determination."

3.  The Conclusion, Part III, slip op. at 17628, is deleted, and replaced by the following:

> "For the reasons set forth above, in No. 09-72457, the judgment of the Tax Court is **AFFIRMED**, except with respect to Taxpayers' 2003 tax liabilities, which is **REMANDED** to the Tax Court for redetermination consistent with this Opinion. In No. 09-72458, the judgment of the Tax Court is **AFFIRMED.** In both appeals, each party shall bear his or her own costs on appeal."

Judge Rawlinson would grant the petition for panel rehearing, but only for the purpose of amending the majority opinion to conform to her concurring opinion.

No further petitions for rehearing shall be entertained.

## OPINION

TASHIMA, Circuit Judge:

This case requires us to decide whether a purported securities loan with a fixed term of at least 250 days and possibly as long as 450 days, entered into not for the purpose of providing the borrower with access to the lent securities, but instead for the purpose of avoiding taxable income for the lender, qualifies for nonrecognition treatment as a securities loan pursuant to § 1058 of the Internal Revenue Code (the "Code"), 26 U.S.C. § 1058.[1] We hold that it does not.

## I. BACKGROUND

### A. Statutory Background

As a general rule, any sale or other disposition of property is a taxable event. § 1001(c). Prior to 1978, there was some uncertainty regarding the application of this general rule to so-called securities lending transactions. These transactions were developed in response to the needs of securities brokers, who frequently faced delays in obtaining securities to deliver to purchasers and therefore were forced to borrow the required securities from organizations and individuals who held such securities in their investment portfolios. *See* S. Rep. 95-762 ("Senate Report"), at 3-4 (1978), *reprinted in* 1978 U.S.C.C.A.N. 1286, 1289. In 1926, the Supreme Court had

---

[1]All subsequent references and citations to a code section are to the Internal Revenue Code, title 26, United States Code.

held that the passage of securities from lender to borrower pursuant to a securities lending agreement, and then back again from borrower to lender at the end of the loan term, were taxable events. *Provost v. United States*, 269 U.S. 443, 459 (1926). Subsequent rulings by the Internal Revenue Service (the "IRS"), however, had taken the opposite position and declared that these transactions were not taxable events. *E.g.*, Rev. Rul. 57-451, 1957-2 C.B. 295, 1957 WL 11085.

In 1978, Congress sought to clear up this confusion by enacting § 1058, which provides that securities lending transactions will not be treated as taxable dispositions. The Senate Finance Committee recognized that such transactions are "desirable" because they reduce the chances that brokers will fail to deliver securities to purchasers within the time required by the relevant market rules. Senate Report at 5, 1978 U.S.C.C.A.N. at 1291. Under § 1058, when a taxpayer transfers securities under an agreement that meets certain enumerated requirements, "no gain or loss shall be recognized on the exchange of such securities by the taxpayer for an obligation under such agreement, or on the exchange of rights under such agreement by that taxpayer for securities identical to the securities transferred by that taxpayer." § 1058(a).

In order to qualify for nonrecognition under § 1058(a), an agreement must:

> "(1) provide for the return to the transferor of securities identical to the securities transferred;
>
> (2) require that payments shall be made to the transferor of amounts equivalent to all interest, dividends, and other distributions which the owner of the securities is entitled to receive during the period beginning with the transfer of the securities by the transferor and ending with the transfer of identical securities back to the transferor; [and]

(3) not reduce the risk of loss or opportunity for gain of the transferor of the securities in the securities transferred."[2]

§ 1058(b).

## B. Factual Background[3]

Petitioners in this case are Henry and Susan Samueli and Thomas and Patricia Ricks (collectively, "Taxpayers"). Both the Samuelis and the Rickses are married couples who filed joint income tax returns for 2001 and 2003. Henry Samueli is the billionaire co-founder of Broadcom Corporation, and Thomas Ricks is an investment advisor to the Samuelis.[4]

In 2000 and 2001, the Samuelis' accountant and tax consultant, Arthur Andersen LLP, and Twenty First Securities, a brokerage and financial firm, jointly designed and marketed to the Samuelis a transaction that was predicated on the expectation that short-term interest rates were going to fall from their then-current levels. After evaluating memoranda prepared by Twenty-First Securities, Thomas Ricks recommended to the Samuelis that they invest in the proposed transaction, and they elected to do so. Thomas Ricks later became a participant in the transaction as well when he acquired a 0.2% stake in it from another pass-through entity affiliated with the Samuelis.

---

[2]Section 1058(b)(4) provides that the agreement must also "meet such other requirements as the Secretary may by regulation prescribe," but no such regulations have been promulgated.

[3]This case was tried on a stipulated set of facts. Thus, none of the facts are controverted.

[4]The entity that actually became a party to the transactions at issue here is The Shiloh Trust ("Shiloh"), the Samuelis' grantor trust, which is a disregarded entity for federal income tax purposes; we refer to Shiloh and Taxpayers interchangeably in this opinion.

In its economic essence, the transaction consisted of Taxpayers purchasing a security with a fixed rate of return determined by interest rates at the time of purchase, and paying for that purchase at a price derived from a variable interest rate. However, the transaction as executed was considerably more complex than that description and is best understood as a series of discrete steps.

### 1.  Step One: Purchase of the Securities; Margin Loan

On October 17, 2001, Taxpayers purchased a $1.7 billion principal "strip"[5] (the "Securities") issued by the Federal Home Loan Mortgage Corporation ("Freddie Mac") from Refco Securities LLC ("Refco"), a securities broker. By purchasing a strip, Taxpayers were purchasing the right to receive the principal on a Freddie Mac bond at the date of maturity but not the right to receive interest payments on that bond prior to maturity. The Securities had a maturity date of February 18, 2003, on which date their holder had the right to receive $1.7 billion. Taxpayers purchased the Securities for $1.643 billion, which meant that cashing in the Securities for their par value on the maturity date would provide them with an annual yield of 2.5810% on the purchase price.

Taxpayers funded the purchase of the Securities with a margin loan (the "Margin Loan") from Refco. The interest rate of the Margin Loan was set at the variable London Interbank Offering Rate ("LIBOR") plus 10 basis points.[6] The Margin Loan was secured by the Securities, and Taxpayers also deposited $21,250,000 with Refco as a condition of obtaining the Margin Loan.

---

[5]"Strip" is an acronym for "Separate Trading of Registered Interest and Principal."

[6]One basis point equals one-one hundredth of a percentage point.

## 2.  Step Two: Loan of the Securities

The plan all along had been for Taxpayers to lend the Securities back to Refco after purchasing them. On or about October 11, 2001, six days before Taxpayers' purchase of the Securities, Taxpayers and Refco had entered into a Master Securities Loan Agreement and an Amendment to the Master Securities Loan Agreement (together, the "Loan Agreement"). The Loan Agreement was on a standard form for securities loan agreements. Taxpayers and Refco then entered into an Addendum to the Loan Agreement (the "Addendum") on October 17, the same day that Taxpayers purchased the Securities.

The Loan Agreement required Taxpayers, as lender, to transfer the Securities to Refco, as borrower. In return, Refco would transfer to Taxpayers collateral with a market value at least equal to that of the Securities. Taxpayers were required to pay Refco a fee (the "Cash Collateral Fee") equal to an agreed-upon percentage of the amount of any such collateral in cash. Refco also was required to "mark to market" the collateral on a daily basis, meaning that if the market value of the Securities went up on any given day, Refco was required to transfer additional collateral to Taxpayers no later than the close of the next business day, so that the market value of the collateral remained equal to the market value of the Securities. The Loan Agreement also provided that Taxpayers could terminate the loan of the Securities at any time, in which event Refco would be required to return the Securities no later than the third business day following notice of termination. All of these terms are standard features of securities lending agreements. *See* Senate Report at 5-6, 1978 U.S.C.C.A.N. at 1291.

The Addendum, however, was a customized document and overrode several of the terms in the Loan Agreement. The provision in the Loan Agreement permitting Taxpayers to terminate the loan and demand return of the Securities on three

business days' notice was superseded by a section of the Addendum entitled "Term of Specified Loan." This section provided that the loan would terminate on January 15, 2003 (approximately one month before the maturity date of the Securities), unless Taxpayers elected to terminate it on either July 1, 2002, or December 2, 2002. The Addendum also specified that, beginning on November 5, 2001, the Cash Collateral Fee would be set at one-month LIBOR plus ten basis points (the same rate as the interest rate under the Margin Loan) and would be re-calculated on the first Monday of each month. The Cash Collateral Fee would "be deemed to be added to the Collateral held by" Taxpayers and would be paid by Taxpayers to Refco when they returned the collateral to Refco at the end of the loan term, unless Taxpayers elected to pay the Cash Collateral Fee, "in whole or in part, prior to termination" of the loan. Finally, the Addendum provided that Taxpayers would retain a deposit of $21,250,000 (the same amount required to secure the Margin Loan) in an account with Refco and would grant Refco a security interest in those funds to secure the performance of Taxpayers' obligations under the Loan Agreement.

On October 19, 2001, two days after they purchased the Securities, Taxpayers transferred the Securities to Refco as required by the Loan Agreement. At the same time, Refco provided Taxpayers with cash collateral of $1.643 billion (the value of the Securities), which Taxpayers then used to pay off the Margin Loan.

### 3.   Step Three: 2001 Fee Payment

On December 28, 2001, Taxpayers determined that the accrued Cash Collateral Fee at that time was $7.8 million, and they wired that amount (the "2001 Fee Payment") to Refco. Approximately two weeks later, Refco returned an identical amount to Taxpayers. This amount was recorded as an increase in the amount of the cash collateral held by Taxpayers.

In December 2002, a representative of Twenty-First Securities discussed with Thomas Ricks the possibility of Taxpayers paying Refco approximately $32 million in accrued Cash Collateral Fee. The representative stated that "two weeks from the date the wire is initiated, the money can be returned to The Shiloh Trust." But Taxpayers did not end up making such a payment in 2002.

### 4.   Step Four: Termination of the Loan

Taxpayers did not exercise their option to terminate the loan in July or December 2002. Accordingly, the transaction terminated on January 15, 2003, as provided for in the Addendum. What happened upon termination, according to Taxpayers, was that Refco purchased the Securities from Taxpayer for the market price of $1.698 billion. Taxpayers owed Refco $1.684 billion (the amount of the cash collateral plus accrued Cash Collateral Fee). The amounts owed were settled via offset, so the only cash that changed hands at this point was $35.3 million transferred from Refco to Taxpayers on January 16, 2003. This amount was the sum of $13.6 million in actual economic gain for Taxpayers (the excess of the price Refco paid Taxpayers for the Securities over the amount Taxpayers had to return to Refco for the collateral), the return of the Taxpayers' $21.25 million deposit, and accrued interest on that deposit of just over one-half million dollars.

### C.   Dispute over Tax Characterization; Procedural Background

On their tax returns for 2001 and 2003, Taxpayers treated the transaction as a securities loan under § 1058. Accordingly, they assumed that their transfer of the Securities to Refco pursuant to the Loan Agreement, and Refco's return of the Securities when the Loan Agreement expired, were not taxable events. Instead, they: (1) treated the Securities as an asset that they acquired in October 2001 for the purchase price and dis-

posed of in January 2003 for the then-market value; and (2) treated the Cash Collateral Fee as interest paid by them to Refco.[7]

Accordingly, on their 2001 returns, Taxpayers claimed an interest deduction for the 2001 Fee Payment in the amount of $7.8 million. (The Samuelis claimed $7,796,903, or 99.8 percent of the total, while the Rickses claimed the remaining 0.2 percent, or $15,667.) On their 2003 return, the Samuelis reported $50,661,926 in long-term capital gain from the sale of the Securities to Refco. This amount represented the proceeds of the sale ($1.697 billion) less the purchase price of the Securities ($1.643 billion), and less transaction costs of $3.56 million, further adjusted to deduct the Rickses' ownership interest in the Securities. The Samuelis also claimed an interest deduction for $32,792,720, which was the amount of Cash Collateral Fee that had accrued on the termination date and was paid to Refco along with the original amount of the Cash Collateral (the "2003 Fee Payment"). (The Rickses did not claim any interest deduction in connection with the termination of the transaction.)

The Commissioner of Internal Revenue (the "Commissioner") rejected this characterization of the transaction. The Commissioner determined that the transaction did not in fact qualify as a securities lending arrangement under § 1058 and instead adopted his own interpretation of the transaction, as

---

[7]Fees paid with respect to cash collateral in securities lending arrangements traditionally are treated as interest, despite the fact that this creates a counterintuitive situation in which the *lender* of securities is paying interest to the *borrower*. The assumption that fees paid on cash collateral are deductible as interest does not have an entirely clear foundation in the law. But neither is there any clear reason to challenge that assertion. The Supreme Court in *Provost* described the fee payments as "interest," 269 U.S. at 452, and the IRS, in a private letter ruling issued not long after § 1058 was passed, described fees paid on cash collateral as "substantially similar" to interest, Priv. Ltr. Rul. 8011100, 1979 WL 53605 (Dec. 21, 1979). In this case, we need not confront the issue of whether this conventional treatment of cash collateral fees as interest is justified.

follows: In October 2001, Taxpayers purchased the Securities from Refco for the purchase price ($1.643 billion) and immediately sold them back to Refco for the amount of the cash collateral (also $1.643 billion). Then, in January 2003, Taxpayers purchased the Securities from Refco a second time pursuant to a "forward contract." The price for this second purchase was the amount of the cash collateral plus accrued Cash Collateral Fee ($1.684 billion). Immediately after this second purchase of the Securities, Taxpayers again sold them back to Refco, this time for their then market value ($1.698 billion). Accordingly, the Commissioner determined that Taxpayers: (1) had no capital gain or loss in 2001 (because they sold the Securities for the same price at which they had purchased them); (2) had $13.54 million in short-term capital gain in 2003;[8] and (3) could not deduct the Cash Collateral Fee payments as interest expense in either year, because no indebtedness ever existed.

Accordingly, in April 2006, the Commissioner issued a Notice of Deficiency for tax years 2001 (in the amount of $2,177,532) and 2003 (in the amount of $171,026) to the Samuelis, and a Notice of Deficiency for tax year 2001 (in the amount of $6,126) to the Rickses. Both the Samuelis and the Rickses filed petitions with the Tax Court seeking redetermination of the deficiencies.[9] Each of Taxpayers and the Commissioner moved for summary judgment; the Tax Court granted the Commissioner's motion. *See Samueli v. Comm'r*, 132 T.C. 37 (2009). Taxpayers timely appealed.

---

[8]Long-term capital gain may be reported only if an asset is held for more than one year. Gain from the sale of an asset held for one year or less is considered short-term capital gain. §§ 1222(1), (3). Long-term capital gain is taxed at a more favorable rate than short-term capital gain.

[9]Upon the joint motion of Taxpayers, the Tax Court consolidated the two petitions.

## II.  DISCUSSION

### A.  Jurisdiction

The Tax Court had jurisdiction over Taxpayers' petitions for redetermination of deficiency pursuant to §§ 6214(a) and 7442. We have jurisdiction over appeals from decisions of the Tax Court under § 7482(a)(1).

### B.  Standard of Review

We review the Tax Court's interpretation of the Code and its legal conclusions *de novo*. *Teruya Bros., Ltd. v. Comm'r*, 580 F.3d 1038, 1043 (9th Cir. 2009). The application of the law to a stipulated factual record, as is presented here, is also reviewed *de novo*. *Sennett v. Comm'r*, 752 F.2d 428, 430 (9th Cir. 1985).

### C.  Section 1058(b)(3)

**[1]** The Tax Court found that the transaction did not qualify for nonrecognition under § 1058 because the Loan Agreement and Addendum failed to meet the requirement of § 1058(b)(3) that a transaction "not reduce the . . . opportunity for gain of the transferor of the securities in the securities transferred." According to the Tax Court and the Commissioner, the transaction failed to meet this requirement because the Addendum permitted Taxpayers to terminate the loan only on one of three dates (July 1, 2002, December 1, 2002, or January 15, 2003), which limited their ability to profit from any short-term increase in the value of the Securities (by reclaiming and selling the Securities) that occurred on any date during the term of the loan, other than the two dates specified in the Addendum. Taxpayers challenge this conclusion (although, as discussed further below, they also contend that § 1058 is not determinative of or even necessarily relevant to the outcome in this case). We agree with the Tax Court's con-

clusion that the transaction did not meet the requirements of § 1058.

**[2]** The plain language of § 1058(b)(3), with the gloss provided by elementary economic analysis, supports the Tax Court's conclusion on this point. Taxpayers relinquished all control over the Securities to Refco for all but two days in a term of approximately 450 days. During this period, Taxpayers could not have taken advantage of a short-lived spike in the market value of the Securities, because they had no right to call the Securities back from Refco and sell them at that increased price until several months later. Common sense compels the conclusion that this reduced the opportunity for gain that a normal owner of the Securities would have enjoyed.

**[3]** The terms of the Addendum reduced Taxpayers' upside exposure to the market value of the Securities in another way as well, which was not highlighted by the Tax Court in its decision. Per the Addendum, if Taxpayers had elected to terminate the loan on either of the two optional early termination dates, Refco would have had the right to purchase the Securities at a LIBOR-based price. On both such dates, the LIBOR-based formula ended up yielding a price that was *higher* than the trading price for the Securities. This means that in all likelihood Refco would not have exercised its right to purchase the Securities if Taxpayers had terminated the transaction on either such date, assuming the same securities were readily available from other sellers. However, had interest rates moved in a different direction, the LIBOR-based formula could have yielded a price that was *lower* than the trading price. If this had been the case, Taxpayers could only have terminated the transaction on one of those dates at the risk of being forced to sell the Securities to Refco for less than their market price. In effect, this further reduced Taxpayers' ability to exit the transaction at will.

Taxpayers argue that their inability to secure the return of the Securities on demand did not affect their ability to recog-

nize gain because the Securities were "zero-coupon bonds whose value [did] not widely fluctuate with windfall profits at some momentary period." This argument is superficially convincing. But it is not a sufficient basis for finding that this transaction *did* comply with § 1058(b)(3). First, the value of the Securities would not need to fluctuate "widely" during the term of the loan to provide opportunities to sell at a profit; when one owns $1.6 billion of a particular security, even a small fluctuation in value can produce a significant opportunity, in absolute terms, for profit. Second, as noted above, even if one could assume that there was zero risk of any fluctuation in the market value of the Securities, Refco's option to purchase the Securities at the LIBOR-based prices still affected Taxpayers' ability to realize the market price of the Securities on the dates when they had the option of getting them back from Refco. Finally, the assumption that the market price of the Securities — Freddie Mac bonds — will never fluctuate widely or unexpectedly seems less valid today than it may have when Taxpayers invested in the Securities. *See, e.g.*, *Suffering a Seizure: America's government takes control of Freddie Mac and Fannie Mae*, The Economist, Sep. 8, 2008, *available at* http://www.economist.com/node/12078933?story_id=12078933 (describing the 2008 federal government takeover of Freddie Mac as being motivated in part by the imperative to maintain the value of its debt securities).

**[4]** Taxpayers point to another section of the Code to support their interpretation of § 1058(b)(3) as accommodating the transaction at issue here. Simultaneously with the enactment of § 1058, Congress amended § 512(b)(1) to provide that "payments with respect to securities loans" received by tax-exempt organizations would not be treated as "unrelated business taxable income." Section 512(a)(5)(A) clarifies that the phrase "payments with respect to securities loans" means "all amounts received in respect of a security . . . transferred by the owner to another person in a transaction to which section 1058 applies," while § 512(a)(5)(B) further clarifies that such

transactions must also be pursuant to an agreement which provides for:

> (i) reasonable procedures to implement the obligation of the transferee to furnish to the transferor, for each business day during such period, collateral with a fair market value not less than the fair market value of the security at the close of business on the preceding business day,

> (ii) termination of the loan by the transferor upon notice of not more than 5 business days, and

> (iii) return to the transferor of securities identical to the transferred securities upon termination of the loan.

§ 512(a)(5)(B).

**[5]** The requirements of § 512(a)(5)(B) are in addition to the requirement in § 512(a)(5)(A) that a transaction comply with the terms of § 1058. Taxpayers argue that interpreting § 1058(b)(3) as requiring that agreements give lenders the right to a return of their securities on demand renders superfluous the requirement of § 512(a)(5)(B)(ii) that a securities lending agreement must provide for "termination of the loan by the transferor upon notice of not more than 5 business days." It is true that courts generally should be "hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 837 (1988). But Taxpayers' argument is unconvincing for several reasons.

First, it is apparent that avoiding redundancy was not a major goal of Congress when it drafted §§ 1058 and 512(a)(5): the requirements of § 1058, incorporated by reference into § 512(a)(5), include the requirement that the securi-

ties lending agreement "provide for the return to the transferor of securities identical to the securities transferred." § 1058(b)(1). But, redundantly, that requirement is then repeated in § 512(a)(5)(B)(iii) (the agreement must provide for the "return to the transferor of securities identical to the transferred securities upon termination of the loan").

Second, Taxpayers' argument ignores the distinction between the requirement that a transaction be terminable upon demand, and a definition of what terminable upon demand means. Section 512(a)(5)(B)(ii) provides the latter: it requires that securities be subject to return within *five* business days of the lender's request. The specification that the notice period be five business days was derived from then-current Securities and Exchange Commission ("SEC") rules governing the lending of securities by regulated investment companies. Those rules had required that the lender be able to terminate the loan with five business days' notice. *See* Senate Report at 5-6, 1978 U.S.C.C.A.N. at 1291. These rules in turn derived their required notice period from SEC rules establishing five business days as the standard settlement time frame for most broker-dealer trades in securities. *See* Securities Transactions Settlement, 59 Fed. Reg. 59,137 (Nov. 16, 1994), 1994 WL 637524 (describing implementation schedule for the "conversion to a T+3 settlement environment" from the "T+5" settlement time frame previously in effect).

**[6]** There is a good reason why the notice period for termination of a securities loan should be the same as the settlement period for sales of securities: if a lender entered into a contract to sell a security that he had loaned to another party, the five-business-day settlement period would mean that he would need to deliver the security to the purchaser within five business days of the contract, so the requirement that the borrower return the security within five business days of notice ensured that the lender would have the security available to deliver to the purchaser on time. In 1994, the SEC amended its regulations to provide that brokers or dealers needed to

deliver most securities within *three* business days of the purchase or sale contract. *See id.*; 17 C.F.R. § 240.15c6-1(a) (1994). Accordingly, the standard notice period for termination of securities lending transactions shifted to three business days, as is apparent from the standard form Loan Agreement used in Taxpayers' transaction. Because the standard notification period for termination of a securities loan can vary, § 512(a)(5)(B)(ii) would not be superfluous even if § 1058(b)(3) implied a requirement that a securities loan be terminable on demand, because § 1058(b)(3) still could be read as permitting a notice period of longer than five days.

**[7]** Third, and most importantly, our conclusion that the transaction at issue in this case reduced Taxpayers' opportunity for gain does *not* necessarily imply a conclusion that a securities loan must be terminable upon demand to satisfy the requirements of § 1058(b)(3). In 1983, the Department of the Treasury considered adopting implementing regulations for § 1058 that would have incorporated the five-business-days notice requirement. The proposed regulations were never adopted, but the debate surrounding them is illuminating. Specifically, proposed 26 C.F.R. § 1.1058-1(b)(3) would have provided that a qualifying agreement must "[n]ot reduce the lender's risk of loss or opportunity for gain. Accordingly, the agreement must provide that the lender may terminate the loan upon notice of not more than 5 business days." Transfers of Securities Under Certain Agreements, 48 Fed. Reg. 33912, 33913 (proposed July 26, 1983). In response to the proposed regulation, the American Bar Association's Committee on Financial Transactions (the "ABA Committee") issued a report objecting to the requirement, in part because it would prevent parties from lending securities for fixed terms longer than five days. The ABA Committee advocated instead a "facts and circumstances" test to address § 1058(b)(3) rather than a bright-line rule and suggested that such a "facts and circumstances" test should "take into account both the length of time until the debt investment security matures and the length of the time the security is borrowed." ABA Committee

Reports on Securities Lending Transactions ("ABA Report"), 91 Tax Notes Today 107-33 (May 15, 1991), Section IV.2.

The ABA Committee's concern that § 1058 not be construed in such a way as to exclude all loans for fixed terms was echoed in a report that the Tax Section of the New York State Bar Association (the "NYSBA Committee") issued in response to several recent decisions of the Tax Court, including its decision now on appeal in this case. Report of the Tax Section of the New York State Bar Association on Certain Aspects of the Taxation of Securities Loans and the Operation of Section 1058 (June 9, 2011) ("NYSBA Report"), at 10-11. We are cognizant that a holding that no securities loan for a fixed term can qualify for § 1058 nonrecognition "could affect commonplace market transactions in a manner that arguably violates the overarching policy of section 1058." *Id.* at 10. But we do not so hold today because the resolution of this case does not require us to do so. First, as will be discussed more thoroughly in the next section of this opinion, we believe this transaction falls outside "the overarching policy of section 1058." Second, the transaction at issue here would fail the "facts and circumstances" test that the ABA Committee proposed as an alternative to a rule that would exclude all fixed-term loans from the scope of § 1058. Taxpayers' inability to terminate the loan except on one of three dates is clearly not "consistent with the continued evolution of commercial practices," ABA Report, Section IV.2, because the current standard practice for loans of bonds like the Securities is to allow termination by the lender on three days' notice (as is evidenced by the terms of the standard form Loan Agreement in this transaction, which were overriden by the Addendum). The length of the loan term under the Addendum (approximately 450 days), the fact that the loan term extended almost to the maturity date of the Securities, and Taxpayers' inability to terminate the loan on any but two dates during that term all severely hampered Taxpayers' ability to take advantage of market fluctuations in the price of the Securities. Moreover, Refco's option to purchase the Securities at the LIBOR for-

mula price meant that Taxpayers' ability to liquidate the Securities at the actual market price was limited even further.

**[8]** As the NYSBA noted, the question of whether securities loans for shorter fixed terms, made for the purposes animating § 1058, qualify for nonrecognition treatment is more appropriately settled by further guidance from the Department of the Treasury and the IRS. NYSBA Report, at 10. The present case does not require us to settle this question; thus, we decline to address it.

### D.  Proper Characterization and Tax Treatment of the Transaction

Taxpayers also argue that, even if the transaction does not qualify for nonrecognition under § 1058, their tax treatment of the transaction was still correct. They make this argument in several ways. First, they argue that their transaction was factually a securities loan that qualified for nonrecognition treatment even if it did not meet the requirements of § 1058(b). (Relatedly, they argue that the Tax Court's characterization of the transaction as two sets of purchases and sales is not supported by the facts of the transaction.) Second, they argue that, even if the Tax Court's characterization of the transaction were correct, Taxpayers still reported its tax consequences correctly.

#### 1.  Whether the Transaction Was Factually a Securities Loan

As an initial matter, the parties dispute the baseline question of whether a transaction may qualify as a securities loan eligible for nonrecognition if it does not fulfill the requirements of § 1058(b). Taxpayers argue that the requirements of § 1058(b) merely create a "safe harbor" and do not delineate the limits of what is considered a securities loan for tax purposes. However, we need not decide today whether § 1058(b) is a safe harbor or the only route to nonrecognition, because

the facts of this case clearly indicate that this particular transaction does not fall within the category of transactions that Congress sought to cover with § 1058.

The Tax Court, in characterizing the transaction as "in substance two separate sales of the Securities," cited the well-established principle that "[f]or Federal tax purposes, the characterization of a transaction depends on economic reality and not just on the form employed by the parties to the transaction." *Samueli*, 132 T.C. at 52. *See, e.g.*, *Teruya Bros., Ltd.*, 580 F.3d at 1043 ("[T]ax classifications turn on the objective economic realities of a transaction rather than the particular form the parties employed.") (internal quotation marks and punctuation omitted). We are cognizant of "the reality that the tax laws affect the shape of nearly every business transaction" and therefore will not recharacterize a transaction merely because tax considerations were one motivation for its particular structure. *Frank Lyon Co. v. United States*, 435 U.S. 561, 580 (1978). However, we may recharacterize a transaction that had "no business or corporate purpose" when "what was done, apart from the tax motive, was [not] the thing which the [relevant tax] statute intended." *Gregory v. Helvering*, 293 U.S. 465, 469 (1935).

Taxpayers' purchase of the Securities, and the funding of that purchase by the Margin Loan, *did* have a non-tax business or corporate purpose. That step of the transaction was motivated by Taxpayers' belief that interest rates would fall. If interest rates were to fall (and they did), holding a security that produced a return based on the interest rate at the time of purchase, and financing that purchase with a loan charging a variable rate, would result in a profit based on the difference between the fixed rate and the variable rate.

If this were Taxpayers' only goal, however, there would have been no need for them to lend the Securities to Refco. Had they not transferred the Securities to Refco, Taxpayers clearly would have been able to secure the tax treatment for

the transaction that they are arguing for here: they would have held the Securities for more than one year and been able to claim long-term capital gains upon their sale, and the interest under the Margin Loan would have been deductible.

**[9]** The sole motivation for adding the purported securities loan to the transaction was tax avoidance. As is explained in marketing materials for the transaction produced by Twenty-First Securities,[10] if Taxpayers had simply bought and sold the Securities, they would have been forced to report the yield on the Securities as interest income (taxed at the highest rate) even though they did not actually receive any payment until the Securities matured. *See* § 1272(a)(1) (providing that the "original issue discount" on debt instruments like the Securities "shall be included in the gross income of the holder"). As the marketing materials explain, however, "when a taxpayer loans a security to a borrower (such as a bond dealer) and certain criteria are met, then the taxpayer lending the security will no longer be treated as the owner of the security for federal tax purposes" and will not be required to report such interest income. The loan was thus conceived as a way for Taxpayers to avoid interest income and generate, as the marketing materials put it, "income taxed at favorable rates and expenses deductible at the highest rate."

Unlike a typical securities lending arrangement, this transaction was designed around minimizing Taxpayers' tax bill rather than around Refco's need to have the Securities available to deliver to its customers. Taxpayers received no compensation from Refco for the loan of the securities. They did "receive" the cash collateral, but that was economically meaningless, because the cash collateral was used to repay the Margin Loan, so that Taxpayers never held it for their own account or earned interest on it. The Cash Collateral Fee was

---

[10]It is not clear from the stipulated record that Taxpayers themselves actually saw these marketing materials before they decided to enter into the transaction.

identical to the interest rate under the Margin Loan, the deposit required under the Addendum was the same as that required for the Margin Loan, and Taxpayers used the cash collateral to pay off the Margin Loan. Because of this, their economic position vis-a-vis Refco was identical to what it would have been absent the Loan Agreement and Addendum except in one key respect: as discussed above, their ability to profit from the sale of the Securities during the term of the loan was severely compromised.

**[10]** Congress' explicit goal in enacting § 1058 was to encourage loans for the benefit of brokers who needed large supplies of securities on hand to deliver to purchasers, because such loans "can have a favorable impact on the liquidity of securities markets." Senate Report at 6, 1978 U.S.C.C.A.N. at 1292. It may be possible that nonrecognition treatment should be given to a transaction that fails to meet all of the specific requirements of § 1058(b), but that nonetheless is motivated by the goals that Congress had in mind when it enacted § 1058. But this loan, a tax shelter marketed as such for which the borrowing broker (Refco) did not pay the lender any consideration, clearly was not "the thing which the statute intended." *Gregory*, 293 U.S. at 469. Indeed, even the ABA Report favored the position that a loan transaction must share the motivations indicated by Congress to receive nonrecognition treatment: the ABA Committee suggested that Treasury issue a regulation "requir[ing] that a Section 1058 securities loan be entered by the borrower for the purposes" which Congress intended. ABA Report, Section IV.2.

**[11]** "Exceptions to the general rule requiring the recognition of all gains and losses on property dispositions are to be 'strictly construed and do not extend either beyond the words or the underlying assumptions and purposes of the exception.' " *Teruya Bros., Ltd.*, 580 F.3d at 1043 (quoting 26 C.F.R. § 1.1002-1(b)). The purported loan at issue here does not fit within the underlying assumptions and purposes of

§ 1058 and should not be afforded nonrecognition treatment as a securities loan.

## 2.  Whether Taxpayers Reported the Transaction Correctly

Taxpayers' second argument is that § 1058 is largely irrelevant and, that their tax treatment of the transaction was correct even if the transaction is not viewed as a securities loan at all. Rather than the purchase and immediate resale of the Securities, creating short-term capital gain, Taxpayers argue that what really happened in 2003 was that they liquidated a contractual right to receive the Securities from Refco (the "Contractual Right"). The Contractual Right was a capital asset that they acquired in consideration of their 2001 sale of the Securities to Refco; their basis in it was the price that first Taxpayers and then Refco paid for the Securities in 2001 ($1.643 billion). Over a year later, in 2003, that asset was liquidated when Refco paid Taxpayers the market value of the Securities in lieu of delivering the actual Securities. The liquidation of the capital asset yielded exactly the long-term capital gain that Taxpayers reported, not the short-term capital gain that the Commissioner argues they should have reported.

[12] Taxpayers are correct that a contractual right of this nature could be a capital asset under § 1221 and that gain attributable to the cancellation or termination of such an asset is capital gain under § 1234A, which provides that "[g]ain or loss attributable to the cancellation, lapse, expiration, or other termination of . . . a right or obligation . . . with respect to property which is (or on acquisition would be) a capital asset in the hands of the taxpayer . . . shall be treated as gain or loss from the sale of a capital asset." § 1234A. *See also Wolff v. Comm'r*, 148 F.3d 186, 188 (2d Cir. 1998) ("[A] gain or loss from the cancellation of a futures or forward contract would result in capital gain or loss pursuant to [§ 1234A].").

[13] The Commissioner in turn argues that Taxpayers' theory is valid only if the Contractual Right was "cancelled" or

"terminated," rather than merely *fulfilled*, in 2003. In other words, if Refco actually did sell the Securities to Taxpayers as the Contractual Right obligated them to do, there was no cancellation or termination of the capital asset, and the Tax Court's interpretation of the 2003 events as yielding short-term capital gain is correct. The Commissioner has the better argument on this point. The Commissioner is correct that there is nothing in the record to support the assertion that Refco "cancelled" or "terminated" its contract with Taxpayers. The Loan Agreement required Refco to return the Securities to Taxpayers, and there is no evidence in the record of any discussion between them that would constitute an acknowledgment that this obligation would not be met. The parties also stipulated in the Tax Court that "Shiloh sold the Securities to Refco" at that time, which Shiloh could not have done if Refco had not first delivered the Securities to Shiloh as Refco was required to do under the Contractual Right.

It is true that the Commissioner's pointing to Taxpayers' and Refco's characterization of the events in 2003 is a bit disingenuous, because the Commissioner's argument and the Tax Court's position is that the labels the parties themselves put on the transaction should be disregarded. But that does not mean that Taxpayers therefore must have the right to call the transaction whatever they want after the fact. It is also true that the 2003 exchange was settled via offset, with Taxpayers neither taking title to the Securities nor transferring any funds to Refco. But given Taxpayers' and Refco's characterization of the transaction as a securities loan and the fact that Taxpayers never actually held the cash collateral in their account, it would have been impossible for the 2003 exchange to be structured otherwise. For example, a transfer of title to Taxpayers in 2003 would have made no sense, because the parties assumed that Taxpayers were already the owner of the Securities.

In addition, Taxpayers' argument implies that the tax treatment of a transaction like this one should be determined by

the relatively trivial matter of whether the purported securities lender received securities or cash equal to the market value of the securities at the end of the loan term. If we were to agree with Taxpayers' argument, then parties to similar transactions could obtain tax treatment equivalent to that which they would have obtained under § 1058, despite not complying with either the letter or the spirit of that provision, merely by making sure that the broker gives the lender cash instead of securities at the end of the term. (The lender could then use that cash to purchase the same securities, if he wished to hold them for a longer period.)

### E.    Interest Deductions

**[14]**  As noted above, lenders in securities lending arrangements who receive cash collateral from the borrower typically pay an interest-equivalent fee on that collateral and deduct the fee as interest. In effect, they act as both lender *and* interest-paying borrower in the transaction. The Tax Court disallowed Taxpayers' interest deductions in this case because it determined that no loan of the Securities occurred in 2001 and that the purported cash collateral on which the Cash Collateral Fee was paid "represented the proceeds of the first sale and not collateral for a securities loan." *Samueli*, 132 T.C. at 53. The Tax Court treated the question of whether Taxpayers' interest deductions should be allowed as largely dependent on the analysis of whether the transaction qualified for § 1058 treatment. Although the Tax Court's ultimate conclusion was correct, this approach was in error.

**[15]** The Code permits taxpayers to deduct "all interest paid or accrued within the taxable year on indebtedness." § 163(a). Indebtedness is "an unconditional and legally enforceable obligation for the payment of money," *Linder v. Comm'r*, 68 T.C. 792, 796 (1977), and is generally found to exist if, at the time funds were advanced, the parties actually intended that they would be repaid, *Welch v. Comm'r*, 204 F.3d 1228, 1230 (9th Cir. 2000). Interest, meanwhile, is

defined in its typical business sense as "compensation for the use or forbearance of money." *Deputy v. DuPont*, 308 U.S. 488, 498 (1940). Taxpayers bear the burden of establishing their entitlement to the interest deduction. *Gatto v. Comm'r*, 1 F.3d 826, 828 (9th Cir. 1993).

### 1.  2001 Fee Payment

[16] In order to address the 2001 Fee Payment, we do not even need to reach the question of whether any indebtedness existed, because the 2001 Fee Payment was not a bona fide interest payment. The Tax Court correctly pointed out that any obligation of Taxpayers to pay the Cash Collateral Fee at any time other than the end of the loan term was entirely illusory. The Addendum clearly provided that Taxpayers did not need to pay the Cash Collateral Fee as it accrued; instead, it would "be deemed to be added to the Collateral held by" Taxpayers, unless they elected to make a payment at any time. The amount of the 2001 Fee Payment was promptly refunded to Taxpayers after it was made, ostensibly to supplement the cash collateral, and Taxpayers were offered the opportunity to make another fee payment close to the end of the 2002 tax year, with the understanding that the money would be promptly returned and added to the cash collateral as well.

[17] Interest payments that are made solely to reduce the tax bill for the payer rather than for the benefit of and at the behest of the payee clearly should not be considered compensation to the payee for the use or forbearance of money. The Tax Court astutely cited the so-called "Livingstone cases" in its opinion. In those cases, the Tax Court and several courts of appeals held that a series of tax-sheltered transactions in which every purported interest payment by the taxpayer was quickly followed by a refund of that amount by the lender did not qualify for interest deductions. The Livingstone cases stand for the principle that payments made in connection with other payments that, together, "add up to zero" or "neutralize one another" should not be honored for tax purposes. *Rubin*

*v. United States*, 304 F.2d 766, 770 (7th Cir. 1962) (quoting *MacRae v. Comm'r*, 34 T.C. 20 (1960)); *see, e.g.*, *Goodstein v. Comm'r*, 30 T.C. 1178, 1188-89 (1958) (a representative Livingstone case disallowing interest payments that were offset by identical payments to the borrower and noting that there was no non-tax reason for the payments to be made when they were). *See also Knetsch v. United States*, 364 U.S. 361, 364-66 (1960) (disallowing interest deductions based on the conclusion that the underlying loan was a sham, in large part because all interest payments during the term of the loan were largely returned to the taxpayer as additional borrowed amounts, and the amount of equity which the taxpayer maintained in the asset which he had used the loan to purchase was minimal).

An analogous principle is embodied in § 1091 of the Code, which prevents taxpayers from claiming loss deductions on "wash sales of stock or securities": if a taxpayer sells shares of stock and acquires or has acquired substantially identical stock within thirty days before or after the sale, he is not permitted to claim a deduction for any loss sustained on the sale. § 1091. If this rule did not exist, any taxpayer could effect a sizable reduction in his tax bill at virtually no economic cost to himself by selling stock worth less than what he paid for it, thus incurring a loss deduction for tax purposes, and immediately repurchasing it at the same price. To permit interest deductions for payments under loan agreements that are made at the borrower's election and that are systematically restored to the borrower within a week or two would lead to a similarly absurd and problematic result.

## 2.   2003 Fee Payment

While the 2001 Fee Payment may have been a sham, we do not agree with the Tax Court's determination that no indebtedness existed on which interest might have accrued. The problem with the Tax Court's determination is that it ignores the fact that the Margin Loan made the entire transaction pos-

sible. The Tax Court's characterization of events fails to explain what happened to the Margin Loan. If it was paid off with the proceeds of the 2001 sale of the Securities by Taxpayers to Refco, then we are left with the question of where Taxpayers got the funds to re-purchase the Securities in 2003. The Tax Court's interpretation of the transaction as *not* involving indebtedness by Taxpayers to Refco makes sense only if we assume that at some point Refco either forgave over a billion dollars of debt owed them by Taxpayers or else provided Taxpayers with a gift of securities worth the same amount. (Either event should have produced taxable income for Taxpayers.)

**[18]** If Taxpayers had simply left the Margin Loan outstanding and paid (non-refundable) interest on that loan on a regular schedule, they likely would have had no problem making the case that the interest should be deductible. As noted above, the cash collateral and the Cash Collateral Fee were economically equivalent to the Margin Loan and the interest thereon. Regardless of whether the purported loan of the Securities was entitled to nonrecognition treatment under § 1058, and regardless of whether it was a true loan, a sale, or something else, Refco did forbear from the use of money when it purchased the Securities for Taxpayers' benefit. *See DuPont*, 308 U.S. at 498. It makes no economic sense to assume that they did so for free. Unlike the 2001 Fee Payment, the 2003 Fee Payment did come out of Taxpayers' pocket, albeit indirectly (it reduced the amount that they received with respect to the Securities in that year).

**[19]** Therefore, the Tax Court erred in disallowing the deduction of the 2003 Fee Payment. Moreover, the amount of the 2001 Fee Payment should be added to the amount that Taxpayers should have been permitted to deduct in 2003, because the fact that the 2001 Fee Payment was a sham does not change the fact that the amount paid was ultimately owed to Refco.

**[20]** This error requires that in No. 09-72457 the case be remanded to the Tax Court for redetermination of Taxpayers Samuelis' 2003 tax liabilities. In No. 09-72458, we affirm the Tax Court's ultimate deficiency determination.

## III.   CONCLUSION

For the reasons set forth above, in No. 09-72457, the judgment of the Tax Court is **AFFIRMED**, except with respect to Taxpayers' 2003 tax liabilities, which is **REMANDED** to the Tax Court for redetermination consistent with this Opinion. In No. 09-72458, the judgment of the Tax Court is **AFFIRMED.** In both appeals, each party shall bear his or her own costs on appeal.

---

RAWLINSON, Circuit Judge, concurring in part, and concurring in the result:

I concur in the vast majority of the excellent opinion, and I concur in the judgment. I write separately only because I do not join that portion of the opinion holding that the Tax Court erred in concluding that the 2003 fee payment did not constitute interest.

The otherwise excellent opinion bases its conclusion regarding the 2003 fee payment on assumptions rather than on the record. *See Opinion*, p. 19801-02. However, we have reviewed these determinations by the Tax Court for clear error. *See Gatto v. Comm'r*, 1 F.3d 826, 828 (9th 1993) ("We review for clear error the Tax Court's determination that an interest deduction . . . was not the result of genuine indebtedness . . . .") (citation omitted). The Samuelis' claimed deduction resulted from a transaction that was similar to the one we considered in *Gatto*—no money was actually exchanged between the parties. *See id*. at 829 (noting that there was no genuine indebtedness when a "loan" was really a promise to

pay money in the future). The assumptions made in the Opinion do not establish clear error on the part of the Tax Court. For that reason, I would affirm the Tax Court decision in its entirety. Nevertheless, I concur in the judgment affirming the Tax Court's ruling.